IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:24-CV-73-BO-BM

DEFENDERS OF WILDLIFE and )
SIERRA CLUB, )
            Plaintiffs, )
 )
v. )     **O R D E R**
 )
THE UNITED STATES FISH AND )
WILDLIFE SERVICE, MARTHA )
WILLIAMS, in her official capacity as )
Director of the United States Fish and )
Wildlife Service; MICHAEL OETKER, )
in his official capacity as Southeast Regional)
Director of the United States Fish and )
Wildlife Service; COUNCIL ON )
ENVIRONMENTAL QUALITY; BRENDA )
MALLORY, in her official capacity as )
Chair of the Council on Environmental )
Quality, )
            Defendants. )

This cause comes before the Court on the parties' cross-motions for summary judgment. The appropriate responses and replies have been filed and a hearing on the motions was held before the undersigned on May 2, 2025, at Raleigh, North Carolina. In this posture, the motions are ripe for ruling. For the reasons that follow, both motions are granted in part and denied in part.

## BACKGROUND

### I. Parties

The United States Fish and Wildlife Service (the "Service") is a federal agency responsible for management and conservation efforts in the National Wildlife Refuge System, which includes the Mattamuskeet National Wildlife Refuge (the "Refuge"). *See* 16 U.S.C. §§ 668dd-668ee. As

part of their duties, the Service is required to ensure agency compliance with the National Environmental Policy Act ("NEPA"), the National Wildlife Refuge System Improvement Act ("Refuge Act"), and other laws. [DE 21] ¶¶ 32, 33. The Council on Environmental Quality ("CEQ") is a federal agency within the Executive Office of the President which is responsible for overseeing the implementation of NEPA and promulgating regulations to be utilized by federal agencies in following NEPA. [DE 1] ¶ 37; [DE 21] ¶ 37.

Along with the various local, state, and federal agencies responsible for conservation efforts, plaintiffs Defenders of Wildlife and the Sierra Club (collectively "plaintiffs" or the "Conservation Groups"), along with their members and supporters, also have an interest in the protection and restoration of the Refuge. The Conservation Groups are nonprofit organizations who participated in the NEPA process, submitted comments on the experimental treatment at issue in this case (the "Project"), and participated in facial challenges to 2020 NEPA regulations promulgated by the CEQ. [DE 1] ¶¶ 14-27, 30; [DE 21] ¶¶ 18, 21, 27.

## II. Factual background

The Refuge is located on the Albemarle-Pamlico Peninsula in eastern North Carolina and contains Lake Mattamuskeet (the "Lake"), the largest natural lake in North Carolina which spans approximately 40,000 acres. Located at roughly the mid-point of the Atlantic Flyway[1], the Lake is a critical resource to migratory birds and provides food and habitat to over 250 species and

---

[1] The Service "and its partners manage migratory birds based largely on routes the birds follow as they migrate between nesting and wintering areas. Based on those routes, four administrative Flyways (Atlantic, Mississippi, Central and Pacific) were established in North America to facilitate management of migratory birds and their habitats." https://www.fws.gov/partner/migratory-bird-program-administrative-flyways (last visited July 22, 2025).

2

hundreds of thousands of individual birds who regularly visit or reside there. FWS_000021; FWS_000027.[2] The Lake is a shallow basin with an average depth of two feet. *Id.*

One of the most difficult challenges facing conservation efforts at the Lake involves submerged aquatic vegetation ("SAV"), a vital food resource for migratory birds who visit the Lake. FWS_000021. The Lake's vegetation was previously dominated by SAV, such as wild celery and redhead grass, which provided a "critical component of the aquatic ecosystem[.]" *Id.* The SAV not only serves as a primary food source for wintering waterfowl, but also helps to stabilize the substrate and provide habitat for fish and other species. *Id.* The presence, or absence, of SAV is an indicator of the overall health of the Lake. FWS_003756; FWS_003766.

Since at least 1981, invasive carp, runoff, and nutrient pollution have caused significant decreases in SAV in the Lake, which in turn allows for increases in the presence of blue-green algae, also known as cyanobacteria. FWS_000021. Cyanobacteria blooms are themselves problematic because they prevent sunlight from reaching SAV, thereby hindering SAV growth. *Id.* At least in part due to diminished food resources resulting from the loss of SAV, there has been a sharp reduction in migratory bird populations at the Lake, from over 30,000 mid-winter tundra swans in 2008 to fewer than 10,000 in 2016. FWS_00027.

In 2018, the North Carolina Wildlife Resources Commission, North Carolina Coastal Federation, Hyde County, and the Service released the Lake Mattamuskeet Watershed Restoration Plan (the "Watershed Plan"), which was the result of a combined effort by these groups to improve the water quality of the Lake. FWS_000021-22. The Watershed Plan identified two priority actions to improve the Lake's water quality, decrease cyanobacteria, and increase SAV: reducing both

---

[2] Citations to FWS_000 and NEPA_000 are to the Bates numbered pages of the Administrative Record lodged with the Court. [DE 29]. Docket entry page number citations are to the CM/ECF-stamped page numbers.

3

carp biomass and external nutrient loading from runoff. FWS_009059. Work has begun on a $1 million contract aimed at removing carp from the Lake. FWS_009093; FWS_009351; FWS_000028. The Conservation Groups maintain that the Watershed Plan is focused on long-term solutions, which do not include short-term algaecide use. [DE 28] at 11 (citing FWS_003598-601).

Despite some disagreement over the origins of the Project,[3] the parties agree that, in approximately September 2022, the University of North Carolina Collaboratory (the "Collaboratory") contacted the Mattamuskeet Refuge Manager and Refuge Biologist about using BlueGreen Water Technologies' algaecide product, LakeGuard Oxy, at the Lake to treat cyanobacteria. FWS_000022. LakeGuard Oxy is a sodium percarbonate-based algaecide which the Environmental Protection Agency labels as "toxic to birds". FWS_000018; FWS_000105-FWS_000111. The EPA has also indicated that LakeGuard Oxy's active ingredient should carry a label stating that it should be kept out of ponds, lakes, and streams and that it is toxic to aquatic invertebrates, fish, and birds. FWS_003544. Implementation of LakeGuard Oxy at the Lake would involve four treated bays, totaling around 400 acres, and four untreated control bays, isolated through turbidity curtains. FWS_000023-24.

---

[3] According to the Conservation Groups, BlueGreen Water Technologies registered several representatives as lobbyists with the North Carolina Secretary of State in May of 2021. *See* FWS_000291. The Conservation Groups assert that a few months later, the North Carolina General Assembly directed the University of North Carolina Collaboratory to "conduct a study to 'evaluate the effectiveness and efficacy' of an algaecide treatment" in North Carolina waters. [DE 28] at 9 (citing 129 Session Law 2021-180, Senate Bill 105, at part II, Section 8.18). The Conservation Groups further contend that the language of the bill, which specified criteria for the algaecide product they would select, "made it a foregone conclusion BlueGreen's Lake Guard Oxy" would be selected. [DE 28] at 10 (citing 129 Session Law 2021-180, Senate Bill 105, at part II, Section 8.18). On the other hand, the Service contends merely that the University of North Carolina Institute of Marine Sciences ("UNC-IMS") and BlueGreen "approached the Service as they were evaluating water bodies in North Carolina for a pilot study for a cyanobacteria treatment." [DE 36] at 13-14 (citing FWS_000022).

4

In September of 2023, the Service issued a Draft Environmental Assessment ("EA") and offered the opportunity for the public to submit comments. FWS_000045. The Conservation Groups commented that the Draft EA included an unreasonable range of alternatives, failed to incorporate relevant scientific information, and constituted predetermined decision-making. FWS_000288-89. The Conservation Groups further urged the Service to prepare a full environmental impact statement ("EIS"). FWS_000312-15. On March 28, 2024, the Service issued a Final EA and Finding of No Significant Impact ("FONSI"). FWS_000016-99.

The Final EA incorporated some mitigating measures to address concerns raised with the Draft EA, including by specifying a treatment window of nineteen months, from April 1 through October 31 of the following year. FWS_000023-24; FWS_000084. While wintering waterfowl are absent during that window, wading bird species such as herons and egrets commonly inhabit the Refuge, while species like Canada geese and wood ducks breed and raise their young. [DE 21] ¶ 132. Moreover, as part of the Final EA, the Service established that five staff members will be charged with monitoring activities and project guidance, with one of their responsibilities being to haze, or disturb to the point of leaving, any wildlife that moves into the area where undissolved product is present. FWS_000030-31; FWS_000038. The Conservation Groups argue that the Project poses a risk to the health of the birds that frequent the Refuge during this time. *See generally* [DE 1]. On the other hand, the Service contends that the treatment period is when waterfowl presence is at its lowest and that those birds which do inhabit the Lake typically use open water areas away from the shore, due to the loss of SAV and the presence of phragmites, an invasive plant. [DE 36] at 15.

5

### III. NEPA Rulemaking

The NEPA implementing regulations issued by the CEQ have gone through multiple rounds of changes in recent years. CEQ finalized the proposed rule challenged here (the "2020 Rule") on July 15, 2020, providing a Regulatory Impact Analysis and announcing it would go into effect two months after publication, on September 14, 2020. NEPA_00000001. In 2022, CEQ issued two phases of rulemaking changes to address alleged flaws in the 2020 Rule: the Phase 1 rulemaking was completed on April 20, 2022, and the Phase 2 rulemaking was completed on May 1, 2024. 87 Fed. Reg. 23,453 (Apr. 20, 2022); 89 Fed Reg. 35,442 (May 1, 2024). The Conservation Groups contend that the NEPA analysis conducted by the Service in preparation for the Project was conducted pursuant to the 2020 Rule, modified slightly by the changes in 2022. [DE 21] ¶ 145.

After the filing of the complaint in this case, other litigation resulted in an order which had the effect of reinstating the 2020 Rule across the country. [DE 39]; *Iowa v. Council on Env't Quality*, 765 F. Supp. 3d 859 (D.N.D. Feb. 3, 2025). On February 25, 2025, the CEQ published an interim final rule removing the 2020 Rule from the Federal Register. [DE 40]; 90 Fed. Reg. 10,610 (Feb. 25, 2025). Defendants argue that this has mooted plaintiffs' facial challenge to the 2020 Rule. *Id.* However, plaintiffs argue that the uncertainty surrounding what NEPA procedures the Service would implement on remand means the 2020 Rule remains relevant to the disposition of this case. [DE 41] at 2-3.

### IV. Procedural History

On May 20, 2024, the Conservation Groups brought the instant lawsuit against the Service, the Service Director, the Southeast Regional Service Director, the CEQ, and the Chair of the CEQ. [DE 1]. The Conservation Groups allege violations of the Refuge Act, NEPA, and the

6

Administrative Procedures Act (APA), 5 U.S.C. §§ 702, *et seq*. [DE 1].[4] The Conservation Groups initially moved for a temporary restraining order and preliminary injunction to stop the Project, but these motions were withdrawn upon an agreement that the Service would halt the Project pending a final judgment in this case. [DE 20]. Now pending before the Court are the parties' cross-motions for summary judgment. [DE 27]; [DE 35].

## DISCUSSION

In this case, plaintiffs bring three categories of claims. First, the Conservation Groups allege that the Service violated the Refuge Act by failing to conduct a compatibility determination before authorizing the Project, *see* 16 U.S.C. §§ 668dd(d)(1)(A), and otherwise acted arbitrarily and capriciously in violation of the APA. In Claims Two through Four, the Conservation Groups allege that the Service violated NEPA by failing to properly consider a reasonable range of alternatives to the Project and predetermining the outcome of the NEPA analysis; by conducting an inadequate analysis of the effects of the Project; and by failing to prepare an Environmental Impact Statement. In Claims Five through Eight, the Conservation Groups raise a facial challenge to the 2020 Rule, claiming that the 2020 Rule is arbitrary and capricious because it failed to consider an important aspect of the problem and further that the 2020 rulemaking was contrary to evidence before the agency, failed to consider reliance interests, and was inconsistent with the governing statute. *See* [DE 1] ¶¶ 221-277.

---

[4] The Conservation Groups spend a portion of their motion for summary judgment arguing that they have Article III standing to pursue their claims. [DE 28] at 17-20. Defendants have not challenged the Conservation Groups' standing. For those reasons outlined by the Conservation Groups, the Court determines that the Conservation Groups had standing to pursue their claims at the commencement of this action. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 732 (2008). However, as discussed more fully below, the Conservations Groups' challenge to the 2020 Rule is now moot.

7

The Conservation Groups seek a declaratory judgment that the Service has violated the Refuge Act, NEPA, and the APA as set forth in the complaint, that CEQ's 2020 Rule was arbitrary and capricious and failed to comply with the law, and that CEQ exceeded its statutory authority when it promulgated the 2020 Rule. The Conservation Groups seek an order directing the Service to conduct a compatibility determination for the Project under the Refuge Act, vacating and setting aside the March 2024 Final EA and FONSI, and directing the Service to conduct a legally compliant NEPA analysis for the Project which does not rely on the 2020 Rule. Finally, the Conservation Groups ask the Court to enjoin the Service from permitting the Project until after the aforementioned remedial steps have been taken and to award the Conservation Groups the costs of this action, including attorney fees. *Id*. at 56-57.

The parties agreed to proceed in this case by way of cross-motions for summary judgment. [DE 20]. Typically, a motion for summary judgment tests whether there are genuine issues of material fact for trial and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). But where, as here, a court is considering motions for summary judgment in a case involving the APA, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Thus, when reviewing agency action under APA, a court does not consider whether there are disputed issues of material fact, but rather must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).

Under the APA, agency action shall be set aside by a reviewing court if its "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

8

"Courts must conduct a 'searching and careful' inquiry into the agency decision, although this review is ultimately a 'narrow' one." *J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1146 (E.D. Va. 1995) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971)). Review of agency action under the APA is highly deferential, *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009), but a court must nonetheless refrain from acting as a rubberstamp. *N. Carolina Wildlife Fed'n v. N. Carolina Dep't of Transp.*, 677 F.3d 596, 601 (4th Cir. 2012). Agency action is reviewed under the APA based upon the "whole record," which means everything that was directly or indirectly considered by the decision-makers. *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989); *S.C. Coastal Conservation League v. Ross*, 431 F. Supp. 3d 719, 722 (D.S.C. 2020).

Agency action must be deemed arbitrary and capricious where the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**A. Refuge Act claim**

The Refuge Act, 16 U.S.C. § 668dd(a)(1), governs the management of the National Wildlife Refuge System (Refuge System) in supporting the primary goal of the Refuge System – administering "a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(2). To that end, the Service must administer the Refuge System in a manner which ensures that this

9

mission is carried out. *Id.* § 668dd(a)(4)(D). "Refuges are first and foremost national treasures for the conservation of wildlife." FWS_000156.

To ensure that the goal of the Refuge System is being carried out, the Service is not permitted to initiate or allow a new use of any refuge unless it has determined that the new use is "compatible with the major purposes" of that refuge. *Id.* § 668dd(d)(1)(A), (d)(3)(A)(i). A compatible use is defined as a "wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the [Service], will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." *Id.* at § 668ee(1). A written compatibility determination is required where the Service is determining whether a use qualifies as compatible, unless the use qualifies as a "refuge management activity." 50 C.F.R. §§ 25.12(a), 26.41. A refuge management activity is a use which is conducted by the Service or a Service-authorized agent and is one which fulfills one or more of the purposes of either the specific refuge or the mission of the Refuge System. 50 C.F.R. § 25.12(a). Examples of refuge management activities include prescribed burns, invasive species control, law enforcement, and water level management. FWS_000155.

Plaintiffs challenge the Service's decision not to conduct a compatibility determination for the Project. In the Final EA, the Service classified the Project as a "refuge management action," which meant it would not need to conduct a compatibility determination. FWS_00086. However, in the Draft EA, the Service did not classify the Project as a refuge management action, and the Court has been presented with no adequate explanation for the change. *See* FWS_008748. In the absence of any real explanation for the change, the decision to reclassify the Project from a new use to a refuge management activity was arbitrary.

The Court agrees with the Conservation Groups that the Project is not properly classified as a refuge management activity. Even assuming, without deciding, that the Project is a Service or Service-authorized agent activity, the Project nonetheless fails to fulfill one of the purposes of the Refuge and Refuge System generally. Whether the application of LakeGuard Oxy would support any other conservation purpose of the Refuge, for example by improving water quality, it cannot seriously be argued that such an action does not also have the potential to directly impair an equally, if not more, important purpose of the Refuge – providing sanctuary to birds. In other words, a new refuge management activity which would fulfill one purpose of the Refuge while impairing another requires the Service to engage in a compatibility determination. Plaintiffs are entitled to summary judgment on this claim.

## B. NEPA claims

With the passage of NEPA, Congress established procedures that federal agencies are required to complete when acting in a way that significantly affects the environment. 42 U.S.C. §§ 4321, 4331. NEPA's purpose is to ensure that agencies will carefully consider environmental impacts and that the public has access to the relevant information so they may participate in the decisionmaking. *Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002) (citations omitted).

"NEPA is a procedural statute; it does not force an agency to reach substantive, environment-friendly outcomes. Rather, NEPA simply requires that the agency take a 'hard look' at environmental impacts before taking major actions." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005). "Courts should afford substantial deference and should not micromanage [] agency choices so long as they fall within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 145 S. Ct. 1497, 1513 (2025).

11

The Court considers first the Conservation Groups' challenge to the Service's issuance of an EA and FONSI, rather than preparation of an EIS. "An agency's decision to rely on an EA instead of preparing an EIS is entitled to deference. Thus, review on the merits is limited to the question of whether the agency reasonably concluded that the proposed action would not significantly impact the quality of the human environment." *S.C. Coastal Conservation League v. United States Army Corps of Eng'rs, Charleston Dist.*, 127 F.4th 457, 471 (4th Cir. 2025) (cleaned up) (quoting *Mt. Lookout-Mt. Nebo Property Protection Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998)).

The Service's conclusion that the Project would not significantly impact the environment was not reasonable. LakeGuard Oxy is known to be toxic to birds, and the Lake is part of an "inviolate sanctuary for migratory birds" and "a refuge and breeding ground for birds and wild animals." FWS_003177. True, the Service has included mitigation measures in order to reduce the likelihood of negatively impacting wildlife in its EA. FWS_ 000093. These include seasonal application limitations, the use of turbidity curtains, and monitoring by Service staff which will include hazing birds which are present in areas where there is undissolved product. *Id.*

But describing the Project as a pilot project and limiting the application of LakeGuard Oxy to only a portion of the Lake does not make the impact of such a substance less significant. As noted above, it is undisputed that LakeGuard Oxy is labeled as toxic to birds, and perhaps its application in another environment not uniquely designated as a sanctuary for birds would be cause for less concern. Nonetheless, the Court must "remain mindful that 'when it is a close call whether there will be a significant environmental impact from a proposed action, an EIS should be prepared.'" *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 590 (4th Cir. 2012) (citation omitted). The EA and FONSI fail to make clear how five Service staff members can

12

adequately monitor 400 acres of the Lake during the application process, and the Court cannot consider any explanations put forth by the Service on this point that are not contained in the EA itself. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50. The Conservation Groups have demonstrated that the Service failed to act reasonably when it declined to prepare an EIS.

Moreover, the EA failed to adequately analyze the impacts of the Project and failed to consider a range of reasonable alternatives. The EA cites to toxicity testing performed by BlueGreen, the Bobwhite Quail Acute Toxicity Report, but it engages in virtually no analysis of the study, other than to use the study in calculating the median acute lethal toxicity dose. *See* FWS_000029. Though application of the algaecide would occur in summer months when wintering waterfowl are absent, many species continue to reside and nest on and near the Lake in summer months, such as wood ducks, great blue herons, and least bitterns. FWS_003366-73. The EA fails to meaningfully assess the impacts of LakeGuard Oxy on the species which will be present during its applications, or meaningfully assess the impacts of hazing on these species.

The no action alternative assessed in the EA was also flawed. "NEPA's requirement that alternatives be studied, developed, and described both guides the substance of environmental decisionmaking and provides evidence that the mandated decisionmaking process has actually taken place." *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988). The EA's description of the no action alternative makes vague reference to the Watershed Plan, FWS_000023, but the Service failed to engage with the potential beneficial outcomes of the Watershed Plan in assessing whether the goals of the Project could be achieved or supported by other means. As plaintiffs discuss, the Service identifies the carp removal project as something which will help improve water quality and clarity, FWS_000028, which would then help support

13

the return of SAV, but this improvement is not assessed when comparing the Project to the no action alternative. *See* FWS_000035-36.

Importantly, the Court has also taken into consideration the fact that the Service was approached by BlueGreen and the Collaboratory with the Project – in other words, the Service did not endeavor to create a pilot project to study the impact of an algaecide at the Lake. Under such circumstances, the agency has "the duty under NEPA to exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project." *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664, 669 (7th Cir. 1997) (quotation and citation omitted). Here, the Service relied primarily on BlueGreen's own statements and studies in determining that the application of LakeGuard Oxy would not substantially impact the environment. *See, e.g.,* FWS_000029-30. Even affording the Service the deference it is due, the failure to adequately explore the environmental impacts of LakeGuard Oxy and assess adverse effects of similar chemicals was arbitrary and capricious. *See, e.g.,* FWS_009477-95; FWS_009515-29.

At bottom, the Conservation Groups have demonstrated that the Service's EA and FONSI omits unexplored and unanalyzed risks to the very inhabitants that the Refuge is designed to protect, and thus that the Service violated NEPA when it failed to prepare an EIS for the Project. The Conservation Groups have further demonstrated that the Service failed to adequately assess or disclose the reasonably foreseeable effects of the Project and failed to objectively evaluate a reasonable range of alternatives. There can be no doubt that the presence of cyanobacteria is critically impacting the health of the Lake. But before engaging in a project, even one which is small-scale, which threatens to harm the Lake's most prized inhabitants, a hard and careful look at the impacts of such action is required. Plaintiffs are entitled to judgment in their favor on their NEPA claims.

### C. 2020 Rule challenge

Plaintiffs have raised a facial challenge to the 2020 Rule, arguing that the CEQ's rulemaking violated the APA. On February 25, 2025, the CEQ published an interim final rule removing the CEQ regulations which implement NEPA, including the 2020 NEPA regulations at which plaintiffs challenge. [DE 40]. That rule went into effect on April 11, 2025. The Service contends that plaintiffs' challenge to the 2020 Rule is now moot.

Article III of the United States Constitution permits a federal court to hear only "cases or controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (citation omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted). Even where a plaintiff has standing at the commencement of an action, "subsequent events can moot the claim." *Pashby v. Delia*, 709 F.3d 307, 316 (4th Cir. 2013).

As is specifically relevant here, "when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot." *Akiachak Native Cmty. v. United States DOI*, 827 F.3d 100, 113 (D.C. Cir. 2016). In response to the Service's notice of the interim rule, the Conservation Groups do not seem to argue that their claim has not been rendered moot. [DE 41]. Rather, they contend that the 2020 Rule remains relevant to the disposition of this case, and note the lack of clarity as to what procedures the Service might apply if it is required to consider its actions again.

The Court is limited, however, to deciding only those issues brought before it. In their complaint, the Conservation Groups allege that the 2020 Rule was promulgated by CEQ in violation of the APA and they seek a declaratory judgment that CEQ's 2020 Rule was arbitrary

15

and capricious and that in promulgating the 2020 Rule CEQ exceeded its statutory authority. Any opinion the Court would give at this point regarding the now-rescinded 2020 Rule would be advisory and thus impermissible. *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021). Plaintiffs' challenge to the 2020 Rule is moot, and the Service is entitled to dismissal of these claims.

In sum, the Conservation Groups have demonstrated that defendants unreasonably failed to prepare an EIS for the Project and otherwise failed to take a hard look at the environmental impacts of the Project. The EA and FONSI are therefore appropriately vacated. Should defendants wish to continue with the Project, an EIS must be prepared. The Conservation Groups have also demonstrated that defendants should have prepared a compatibility determination for the Project. The Court will not, however, opine as to the appropriate NEPA rules and regulations on which defendants must rely should they continue with the Project, as the Conservation Groups' challenge to the 2020 Rule is moot.

## CONCLUSION

Accordingly, for the foregoing reasons, plaintiffs' motion for summary judgment [DE 27] is GRANTED IN PART and DENIED IN PART. Defendants' motion for summary judgment [DE 35] is also GRANTED IN PART and DENIED IN PART.

Plaintiffs are entitled to judgment in their favor on Claims One through Four of their complaint. Defendant is entitled to judgment in its favor on Claims Five through Eight of the complaint, insofar as these claims are DISMISSED as MOOT.

Defendants have violated the Refuge Act, NEPA, and the APA as outlined in Claims One through Four of the complaint. The March 2024 Final EA and FONSI are hereby VACATED. The clerk is DIRECTED to enter judgment and close the case.

SO ORDERED, this __22__ day of July 2025.

*Terrence Boyle*
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE